**EXHIBIT H**

IN THE MATTER OF THE ARBITRATION BETWEEN:

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA., ON BEHALF OF ITSELF AND
EACH OF THE RELATED INSURERS THAT
PROVIDED COVERAGE TO RESPONDENT,

                         Claimants,

            - and -

PETROCELLI ELECTRIC CO., INC.,

                        Respondent.

## DEMAND FOR ARBITRATION

TO:   **Petrocelli Electric Co., Inc.**
       **22-09 Queens Plaza North**
       **Long Island City, NY 11101**

        National Union Fire Insurance Company of Pittsburgh, Pa., on its own behalf and on behalf of each of its related companies (collectively, "Claimant") that provided coverage to Petrocelli Electric Co, Inc. ("Respondent") from 1995 to 2002 pursuant to the Agreements (defined below), asserts a claim for all amounts owed to it from coverage years 1995 to 2002 as premiums, expenses, fees, reimbursement, damages or as security pursuant to the documents (collectively, the "Agreements") annexed hereto as **Exhibit A**.   A calculation showing total receivables of $2,190,426., based upon losses and fees valued as of July 31, 2007, is attached hereto as **Exhibit B**. Claimant reserves the right to update its claim based upon subsequent losses and fees.   The Agreements provide for arbitration of this dispute pursuant to an Arbitration Clause set forth therein and Claimant hereby demands arbitration thereunder.

## RELIEF CLAIMED AND NATURE OF DISPUTE

Claimant seeks an award determining all amounts due it under the Agreements and an award providing for payment of all such amounts, plus interest. Claimant further seeks an award of security.

## DEMAND FOR ARBITRATOR

Claimant hereby demands that Respondent appoint an arbitrator within thirty (30) days of receipt of this Demand and notify Claimant in writing at the address stated below of such appointment.

## CPLR SECTIONS 7502(a)(i) and 7503(c)

Please take notice that Claimant invokes Sections 7502(a)(i) and 7503(c) of the CPLR for the sole purpose of notifying Respondent that unless Respondent applies to stay the arbitration in a court in New York County, New York, within twenty (20) days after such service of this Demand for Arbitration, Respondent shall thereafter be precluded from objecting that a valid agreement to arbitrate was not made. In all other respects, Claimant affirmatively asserts that the United States Arbitration Act, Title 9 of the United States Code, shall apply to this arbitration.

Dated:    New York, New York
          February 19, 2008

Michael S. Davis
Yoav M. Griver
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400
Attorneys for Claimant

2

# EXHIBIT A



# Payment Agreement

For

## Insurance and Risk Management Services

effective on the 1st day of June, 2000

by and between *us*,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**

And *you, our* Client

**Petrocelli Electric Co Inc.**
**22-09 Queens Plaza North**
**Long Island City, NY 11101**

in consultation with *your* representative

**Allied Coverage Corp of NJ**
**20 Commerce Drive**
**Cranford, NJ 07016**

PAYMENT AGREEME.. . ſ

# TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your* Payment Obligation? | 4 |
| When Must *You* Pay *Your* Payment Obligation? | 4 |
| What Is the Payment Plan? | 5 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 8 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 10 |
| Are *You* Authorized to Make This Agreement? | 10 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

## PAYMENT AGREEME.. r

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *you*, the organization(s) named as "our Client" in the *Schedule*, and
- *us*, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the Schedule.

## WHAT HAVE *YOU* AND *WE* AGREED TO?

*We* **have agreed** to the following:
- to provide *you* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *you* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *you* make partial payments according to this Agreement.

To induce us to agree as above,

*You* **have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any policies and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *you* and we have settled and paid all obligations between *you* and us relating to this Agreement. Neither *you* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies,* or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.
2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *you* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3. **"Loss"** or **"Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4. **"Policy"** or **"Policies"** means:
   - any of the insurance policies described by their policy numbers in the *Schedule,* and their replacements and renewals;
   - any additional insurance policies that we may issue to *you* that *you* and we agree to make subject to this Agreement;
5. **"Retained Amount"** or **"Retention"** means one of the following:
   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

## PAYMENT AGREEMENT

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *you* and us.

7. **"You"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that you must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *you* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance policies and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to you whenever *your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance policies to which such obligations pertain. Any extension of unsecured credit to *you* under this Agreement is extended only for the duration of the policy year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to you under this Agreement, including any deferral or waiver of the collection of collateral from *you* is not an assumption by us of any of *your* obligations to us. Any extension of credit to *you* does not limit our right to enforce *your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to you. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the policy year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or your evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## PAYMENT AGREEMENT

### WHAT IS THE PAYMENT PLAN?

#### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *you* when *you* have paid us all amounts due us.

If the total amount of claims we shall have paid on *your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *you* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

#### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

### WHAT IS THE BILLING METHOD?

**Deposit and Installments:** You must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the **Direct Billing Method** or the **Automatic Withdrawal Method**, or a combination of both. *Your* choice is shown in the *Schedule*.

#### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *you* as necessary for the payment of *Losses* we must pay or have paid within *your "Retention"* and *your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

#### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *your "Retention"* and *your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

*You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *your Retention* and *your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *you*.

## PAYMENT AGREEMENT

### WHAT ABOUT COLLATERAL?

#### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to *Your Payment Obligation*.

#### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *you* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *you* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

#### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *you* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which you must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *you* have satisfied all *your* obligations under this Agreement and the *Policies*. If *you* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

#### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *you* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

#### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *you*, *your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and *we* will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *you* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *you* is indicated, we will return annually the indicated amount to *you* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *you* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *you*. However, we are not obligated to return collateral to *you* if *you* are in default of any provision of this Agreement or any other similar agreement relating to your primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request.

If *you* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *you* must provide us copies of *your* audited annual financial statements.

If we so request, *you* must provide us such financial information as we may reasonably deem necessary to determine *your* financial condition, including but not limited to copies of *your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at your option, provide us with the same notices at the same time that you provide such notices to any other creditor regarding any material financial or operational condition that *you* are obligated to report to such other creditor.

# WHAT IS DEFAULT?

Default is any of the following:

1. failure by *you* or any of *your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *you* or any of *your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *your* insolvency, or the occurrence of any of the following:
    - the commencement of liquidation or dissolution proceedings, *your* general failure to pay debts as they become due, general assignment by *you* for the benefit of creditors, the filing by or against *you* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *your* property; or
    - *your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *you*, without *our* prior consent, of any *Policy* material to this Agreement. However, your concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *you* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

PAYMENT AGREEMENT

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *you*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *you* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *you* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *you* or any of *your* subsidiaries or affiliates.

7. We may satisfy *your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *you* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *you* disagree with us about any amount of *Your Payment Obligation* that we have asked *you* to pay, within the time allowed for payment *you* must:

- give us written particulars about the items with which *you* disagree; and
- pay those items with which *you* do not disagree.

We will review the disputed items promptly and provide *you* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *you* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, you may have reasonable additional time to evaluate our response to your written particulars.

So long as you are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *you* have submitted a dispute to arbitration. We must notify *you* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *you* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

# PAYMENT AGREEMENT

**Qualifications of arbitrators:** Unless *you* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *your*s, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *you* and we consent to an extension. The majority decision of any two arbitrators, when filed with *you* and us will be final and binding on *you* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *you* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *you* at *your* address in the *Schedule*. *You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither you nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *you* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *you* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *you* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## PAYMENT AGREEMENT

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *your* behalf has full right and authority to execute and deliver this agreement and to bind *you jointly and severally.*

## SIGNATURES

TO SIGNIFY AGREEMENT, *you* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This 9th day of November, 2000

Signed by _____

Typed Name Louis Iglesias

Title Senior Vice-President - AIG Construction Risk Management

For *you*, our Client

*Petrocelli Electric Co Inc.*

In _____

This 13 day of November , 20 00

Signed by _____

Typed Name Santo Petrocelli Jr.

Title President

# Schedule of Policies and Payments

## Paid-Loss Payments Plan

Effective from 6/1/2000 to 6/1/2001

Annexed to the PAYMENT AGREEMENT

effective on  6/1/2000

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

on behalf of itself and all its affiliates including but not limited to

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
and *you*, our Client

## *Petrocelli Electric Co Inc.*

on behalf of *your*self and all *your* subsidiaries or affiliates except those listed below:

. *(None)*

For our use only: Contract Number 851604

*Your* Address:
Street   22-09 Queens Plaza North
City      Long Island City State NY        Zip 11101 Telephone

*Your* Representative: Mark Sullivan
Firm:    Allied Coverage Corp Of NJ
Street   20 Commerce Drive
City      Cranford        State NJ        Zip 07016 Telephone 908-709-2075

*Our* Account Executive: Anthony Zaza
American International Group
Street   160 Water Street  20th Floor
City      New York        State NY        Zip 10038 Telephone 212-837-3000

*Our* Law Representative: Dbg Legal
American International Group
Street   160 Water Street 24th Floor
City      New York        State NY        Zip 10038 Telephone 212-770-7000

Remit Payments to: American International Group
American International Group
Street   PO Box 10642
City      Newark  State NJ        Zip 07193 Telephone

Remit Collateral to: Arthur Stillwell
American International Group
Street   70 Pine Street  4th Floor
City      New York        State NY        Zip 10270 Telephone 212-770-8428

## A. *Policies* and Other Agreements

Workers' Compensation and Employers Liability Insurance

Commercial General Liability Insurance
GL 933-10-14
Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Pay-ment No. | Due Date | Provision for Expenses and Excess Losses [(1)] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [(2)] | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| Deposit | 7/1/2000 | $126,108.00 | $0.00 | $0.00 | $0.00 | $126,108.00 |
| 2 | 7/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 3 | 8/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 4 | 9/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 5 | 10/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 6 | 11/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 7 | 11/14/2000 | $0.00 | $0.00 | $0.00 | $916,958.00 | $916,958.00 |
| 8 | 12/1/2000 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 9 | 1/1/2001 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 10 | 2/1/2001 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 11 | 3/1/2001 | $42,038.00 | $0.00 | $0.00 | $0.00 | $42,038.00 |
| 12 | | $0.00 | $0.00 | $0.00 | $0.00 | $ 0.00 |
| 13 | | $0.00 | $0.00 | $0.00 | $0.00 | $ 0.00 |
| Subtotals | | $504,450.00 | $ 0.00 | $ 0.00 | $916,958.00 | $1,421,408.00 |
| DLP* | | N/A | N/A | N/A | $0.00 | $ 0.00 |
| DEP* | | $0.00 | $0.00 | $0.00 | N/A | $ 0.00 |
| Totals | | $504,450.00 | $ 0.00 | $ 0.00 | $916,958.00 | $1,421,408.00 |

**DLP** means "Deferred Loss Provision". This is the estimated amount you must pay us as "Regular Loss payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that you must pay us as follows:

**Notes:** (1) "Provision for Expenses and Excess Losses" is a part of the Premium

(2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Limit) and *your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify you as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *you* the amounts of *Loss* and *ALAE* that we have paid under the *Policies. You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *you* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *your Retention* and *your* share of *ALAE* that we will have paid under the *Policies,* less all amounts *you* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *your Retention* and *your share of ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$0**, *you* must pay us the amount of that payment of *Loss* within 10 days after *you* receive our bill.

**Billing Method:**

☒ Billing to

  ☐ *You* at *your* address shown in the Schedule, or

  ☒ *Your* Representative at its address shown in the Schedule; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies:     Minimum Amount: $0

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date **66** months after the inception of such *policy.*

On or shortly after the Conversion Date upon the presentation of our invoice, you must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *policies.*

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| | $0 |
| | $0 |
| | $0 |
| | $0 |
| **Total Collateral on Hand** | **$  0** |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Bond | $916,958 | 11/14/2000 |
| | $0 | |
| | $0 | |
| **Total Additional Collateral Required** | **$916,958** | |
| **Total Collateral Required** | **$916,958** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *you* in the event of the following:

a.   Credit Trigger:

   i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

   ii. If S&P or Moody's withdraws any such rating.

We may require and you must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *your* collateral that we hold.

Name of Entity:        Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     | $0                         |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of your delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *you* and we have caused this *"Schedule"* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.,** on behalf of itself and all its affiliates,

this 09th  day of November, 2000

Signed by _____

Typed Name Louis Iglesias

Title Senior Vice President - Aig Construction Risk Mgmt

For you: *Petrocelli Electric Co Inc.*

this 13  day of Nov., 2000

Signed by _____

Typed Name Santo Petrocelli Jr.

Title President



# Payment Agreement

For

## Insurance and Risk Management Services

effective on the 1st day of June, 2001

by and between *us*,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**

And *you, our* Client

**Petrocelli Electric Co Inc.**
**22-09 Queens Plaza North**
**Long Island City, NY 11101**

in consultation with *your* representative

**Allied Coverage Corp of NJ**
**20 Commerce Drive**
**Cranford, NJ 07016**

## PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your* Payment Obligation? | 4 |
| When Must *You* Pay *Your* Payment Obligation? | 4 |
| What Is the Payment Plan? | 5 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 8 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 10 |
| Are *You* Authorized to Make This Agreement? | 10 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *you*, the organization(s) named as "our Client" in the *Schedule*, and
- *us*, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND *WE* AGREED TO?

*We* **have agreed** to the following:
- to provide *you* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *you* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *you* make partial payments according to this Agreement.

To induce us to agree as above,

*You* **have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any policies and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *you* and we have settled and paid all obligations between *you* and us relating to this Agreement. Neither *you* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.
2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *you* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3. **"Loss"** or **"Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4. **"Policy"** or **"Policies"** means:
   - any of the insurance policies described by their policy numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance policies that we may issue to *you* that *you* and we agree to make subject to this Agreement;
5. **"Retained Amount"** or **"Retention"** means one of the following:
   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

## PAYMENT AGREEMENT

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *you* and us.

7. **"You"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that you must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *you* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION?*

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance policies and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to you whenever *your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance policies to which such obligations pertain. Any extension of unsecured credit to *you* under this Agreement is extended only for the duration of the policy year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to you under this Agreement, including any deferral or waiver of the collection of collateral from *you* is not an assumption by us of any of *your* obligations to us. Any extension of credit to *you* does not limit our right to enforce *your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to you. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the policy year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION?*

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or your evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

# PAYMENT AGREEMENT

## WHAT IS THE PAYMENT PLAN?

### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *you* when *you* have paid us all amounts due us.

If the total amount of claims we shall have paid on *your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *you* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

## WHAT IS THE BILLING METHOD?

**Deposit and Installments:** You must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the **Direct Billing Method** or the **Automatic Withdrawal Method**, or a combination of both. *Your* choice is shown in the *Schedule*.

### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *you* as necessary for the payment of *Losses* we must pay or have paid within *your* "*Retention*" and *your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *your* "*Retention*" and *your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

*You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *your* Retention and *your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *you*.

## PAYMENT AGREEMENT

### WHAT ABOUT COLLATERAL?

#### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance policies or agreements to *Your Payment Obligation*.

#### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *you* deliver to us to secure *Your Payment Obligation. You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *you* and are now or may in the future come into our possession in connection with *Your Payment Obligation. You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

#### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *you* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which you must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *you* have satisfied all *your* obligations under this Agreement and the *Policies*. If *you* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

#### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *you* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

#### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually.  In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this  Agreement applies,
2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,
3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *your* property, assets, business or equity to any other entity,
4. any material adverse change in the financial condition of *you, your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and *we* will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *you* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *you* is indicated, we will return annually the indicated amount to *you* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *you* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *you*. However, we are not obligated to return collateral to *you* if *you* are in default of any provision of this Agreement or any other similar agreement relating to your primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request.

If *you* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *you* must provide us copies of *your* audited annual financial statements.

If we so request, *you* must provide us such financial information as we may reasonably deem necessary to determine *your* financial condition, including but not limited to copies of *your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

*Give* us prompt notice of the event of any default as described in the section titled "What is Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at your option, provide us with the same notices at the same time that you provide such notices to any other creditor regarding any material financial or operational condition that *you* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *you* or any of *your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *you* or any of *your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *your* general failure to pay debts as they become due, general assignment by *you* for the benefit of creditors, the filing by or against *you* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *your* property; or

   - *your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *you*, without *our* prior consent, of any *Policy* material to this Agreement. However, your concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *you* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## PAYMENT AGREEMENT

### WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *you*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *you* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *you* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *you* or any of *your* subsidiaries or affiliates.

7. We may satisfy *your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *you* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *your* obligations.

### HOW WILL DISAGREEMENTS BE RESOLVED?

#### What if we disagree about payment due?

If *you* disagree with us about any amount of *Your Payment Obligation* that we have asked *you* to pay, within the time allowed for payment *you* must:

- give us written particulars about the items with which *you* disagree; and
- pay those items with which *you* do not disagree.

We will review the disputed items promptly and provide *you* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *you* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, you may have reasonable additional time to evaluate our response to your written particulars.

So long as you are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

#### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *you* have submitted a dispute to arbitration. We must notify *you* in writing as soon as we have submitted a dispute to arbitration.

#### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *you* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

## PAYMENT AGREEMENT

**Qualifications of arbitrators:** Unless *you* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *yours*, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *you* and we consent to an extension. The majority decision of any two arbitrators, when filed with *you* and us will be final and binding on *you* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *you* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *you* at *your* address in the *Schedule. You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither you nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *you* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *you* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *you* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

# PAYMENT AGREEMENT

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *your* behalf has full right and authority to execute and deliver this agreement and to bind *you jointly and severally.*

## SIGNATURES

TO SIGNIFY AGREEMENT, *you* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This 1st day of June, 2001

Signed by _____

Typed Name Daniel Conway

Title Authorized Representative

For *you,* our Client

**Petrocelli Electric Co Inc.**

In __Long Island City, N.Y.__,

This _15_ day of __October__, 20_01_

Signed by _____

Typed Name __Norman Fidelman__

Title __V.P. Finance__

# Schedule of Policies and Payments

## Paid-Loss Payments Plan

Effective from 6/1/2001 to 6/1/2002

Annexed to the PAYMENT AGREEMENT

effective on 6/1/2001

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

on behalf of itself and all its affiliates including but not limited to

**American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company**
and *you*, our Client

# *Petrocelli Electric Co Inc.*

on behalf of *your*self and all *your* subsidiaries or affiliates except those listed below:

*(None)*

For our use only: Contract Number 851604

| | |
|---|---|
| *Your* Address: | |
| Street | 22-09 Queens Plaza North |
| City | Long Island City State NY       Zip 11101 Telephone |
| *Your* Representative: Judy Santore | |
| Firm: | Allied Coverage Corp Of NJ |
| Street | 20 Commerce Drive |
| City | Cranford       State NJ       Zip 07016 Telephone 908-709-2075 |
| *Our* Account Executive: Anthony Zaza | |
| American International Group | |
| Street | 160 Water Street   20th Floor |
| City | New York       State NY       Zip 10038 Telephone 212-837-3085 |
| *Our* Law Representative: Dbg Legal | |
| American International Group | |
| Street | 175 Water Street |
| City | New York       State NY       Zip 10038 Telephone 212-770-7000 |
| Remit Payments to: American International Group | |
| American International Group | |
| Street | PO Box 10642 |
| City | Newark  State NJ       Zip 07193 Telephone |
| Remit Collateral to: Arthur Stillwell | |
| American International Group | |
| Street | 70 Pine Street  4th Floor |
| City | New York       State NY       Zip 10270 Telephone 212-770-8428 |

## A. *Policies* and Other Agreements

Workers' Compensation and Employers Liability Insurance

Commercial General Liability Insurance
GL 933-10-14
Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Pay-ment No. | Due Date | Provision for Expenses and Excess Losses [1] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [2] | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| Deposit | 7/1/2001 | $140,262.00 | $0.00 | $0.00 | $0.00 | $140,262.00 |
| 2 | 7/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 3 | 8/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 4 | 9/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 5 | 10/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 6 | 11/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 7 | 12/1/2001 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 8 | 1/1/2002 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 9 | 2/1/2002 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 10 | 3/1/2002 | $46,756.00 | $0.00 | $0.00 | $0.00 | $46,756.00 |
| 11 | | $0.00 | $0.00 | $0.00 | $0.00 | $ 0.00 |
| 12 | | $0.00 | $0.00 | $0.00 | $0.00 | $ 0.00 |
| 13 | | $0.00 | $0.00 | $0.00 | $0.00 | $ 0.00 |
| | Subtotals | $561,066.00 | $ 0.00 | $ 0.00 | $ 0.00 | $561,066.00 |
| | DLP* | N/A | N/A | N/A | $0.00 | $ 0.00 |
| | DEP* | $0.00 | $0.00 | $0.00 | N/A | $ 0.00 |
| | Totals | $561,066.00 | $ 0.00 | $ 0.00 | $ 0.00 | $561,066.00 |

**DLP** means "Deferred Loss Provision". This is the estimated amount you must pay us as "Regular Loss payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that you must pay us as follows:

**Notes:**  (1) "Provision for Expenses and Excess Losses" is a part of the Premium
    (2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Limit) and *your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify you as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *you* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *you* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *your Retention* and *your* share of *ALAE* that we will have paid under the *Policies,* less all amounts *you* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *your Retention* and *your share* of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$0**, *you* must pay us the amount of that payment of *Loss* within 10 days after *you* receive our bill.

**Billing Method:**

☒ Billing to.

    ☐ *You* at *your* address shown in the Schedule, or

    ☒ *Your* Representative at its address shown in the Schedule; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies:    Minimum Amount: $0

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date **66** months after the inception of such *policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, you must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Bond | $916,958 |
| | $0 |
| | $0 |
| | $0 |
| **Total Collateral on Hand** | **$916,958** |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| | $0 | |
| | $0 | |
| | $0 | |
| | $0 | |
| **Total Additional Collateral Required** | **$  0** | |
| **Total Collateral Required** | **$916,958** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *you* in the event of the following:

a.  Credit Trigger:

i.  If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

ii.  If S&P or Moody's withdraws any such rating.

We may require and you must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *your* collateral that we hold.

**Name of Entity:**          **Type of Debt Rated:**

### Ratings at Effective Date

| S&P | Moody's | | Unsecured Exposure at Effective Date |
|-----|---------|---|-------------------------------------|
|     |         |   |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|---------------------------|
| AA- | Aa3     |                           |
| A-  | A3      |                           |
| BBB | Baa2    |                           |
| BB  | Ba2     | $0                        |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of your delivery of additional collateral to us due to the requirements under Item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *you* and we have caused this *"Schedule"* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.,** on behalf of itself and all its affiliates,

this 01st day of June, 2001

Signed by _____

Typed Name Daniel Conway

Title Authorized Representative

For *you*: *Petrocelli Electric Co Inc.*

this _____ day of OCT, 2001

Signed by _____

Typed Name *Norman Fidelman*

Title *V.P. Finance*